Will her argument next in No. 2218, Pia Santilli v. U.S. Oncology. Thank you. Mr. — well, let's wait a minute for people to get settled. Just let me know when you're good. Okay, Mr. Singh, whenever you're ready. May it please the Court, I'm Thaginder Singh for the appellants. We ask this Court to reverse the District Court's judgment dismissing this complaint at the pleading stage. My clients were the first ones to identify U.S. Oncology's systematic solicitation of kickbacks from pharmaceutical manufacturer Amgen. They provided a complaint that includes substantial details about that ongoing misconduct, describing who at U.S. Oncology was involved, what sorts of kickbacks were solicited, and how U.S. Oncology effectively over a period of years took its physicians' prescribing decisions and offered them up as a lure to Amgen for discounts on important drugs to boost its bottom line. Those allegations don't appear in any of the prior public complaints. And so I'll lead, unless you'd like me to skip it, with the public disclosure issue, which is one of the two major issues in the case. As we've explained in our briefing, the rule is that a defendant — in order for a public disclosure to occur, that is, in order for a relator's complaint to be based upon the allegations or transactions that are in a public disclosure, the public disclosure has to either identify the defendant by name or come so close that the defendant is directly identifiable. There is nothing in the public disclosures that have been discussed in this case that would allow a reasonable person to identify U.S. Oncology. The public disclosures involve — Why is that? So the public disclosure does talk about the scheme at Amgen to offer — the alleged scheme at Amgen to offer kickbacks or incentives and rebates and so on, right? And it says that it's doing that with its clients. It even mentions some of the drugs in the complaints, like Epigen and so on, and these are drugs that U.S. Oncology would have used because they're cancer drugs, right? Yes. So wouldn't somebody reasonably reading this say — or reading that complaint say, okay, Amgen is offering kickbacks to its clients for cancer drugs. U.S. Oncology buys a lot of cancer drugs from Amgen, and so I think that's what's going on. That is something that someone could possibly imagine, but that's not what triggers the public disclosure bar. In order for the public disclosure bar to be triggered, and just think about this Court's cases, you know, Kreindler, which is the case that they cite the most, is the one that says this part of the statute is there to stop people who come to seek a return even though they contributed nothing to the exposure of a fraud. And what I would say is if all you did was look at the public disclosures, which we all agree never mention U.S. Oncology, the closest they come is to say some customers were getting kickbacks. What those disclosures wouldn't tell you is that U.S. Oncology itself engaged in this culpable misconduct of soliciting the kickbacks. But why would that matter? So the False Claims Act is not about the scheme. It's about the false claim for payment, right? So if Amgen is offering kickbacks or U.S. Oncology is soliciting kickbacks, the problem is whether there's a false claim for payment of a drug that shouldn't have been prescribed or wasn't eligible for payment or something like that, right? Well, to be clear, that's not disclosed either. I mean— Does it matter? Like does it change whether something is—does it put you on the trail of additional false claims to know that U.S. Oncology, in fact, was soliciting kickbacks as opposed to being offered them? Yeah, I think it speaks directly to U.S. Oncology's culpability in the matter because they have to knowingly present false claims in order to be liable under the FCA. So the fact that they're not just some passive recipient of kickbacks but are themselves negotiating for these and really pressing for them, we think it does actually—it is a big deal. It is the reason why they are culpable as opposed to just Amgen being culpable. And so we do think it's quite, quite important. But just to be clear about this, on the core point on which I think all the precedents around the country are pretty much unified, there is a need for the defendant to be directly identifiable. And what you're talking about when you talk about the class of customers implicated by the public complaints is every major pharmaceutical customer, every hospital, every physician's practice, and other entities as well, group purchasing organizations of which there are hundreds, you name it. Even the public disclosure on its own, the complaint against Amgen, the theory would be that Amgen is providing kickbacks and so it's leading to prescriptions that wouldn't otherwise be made. Right? And that's what makes them a false claim because they're being induced to make claims for payment that wouldn't otherwise be made but for the kickback. Right? That's the theory. No, Your Honor. That's not the theory. So what is the theory? So we cite a case in our opening brief in the statement of the case sections, the Greenfield decision, which explains that but-for causation actually isn't required to have an FCA violation. When you submit a claim for payment for a drug or under Medicare Part B, for example, you have to say—you have to certify your compliance with the anti-kickback statute. That certification becomes false if you've been knowingly violating the anti-kickback statute. And so that's what makes the claims false. It's not a but-for causation. And this is actually an important point when we get to the Rule 9b question because what the other side likes to tell you again and again is you have to identify the claims. You have to identify the claims. You must tell us about the specific claims for payment. In certain types of cases, I would agree with them. But a kickback case is special because the kickbacks taint the claims per se. So you don't have to do that sort of claim-by-claim evaluation, which is—I'm getting ahead of myself to talk about Rule 9b, but I do want to make it clear what the theory of liability is. Does that mean that if, in fact, you had a complaint against Amgen just based on the kickback scheme, you couldn't actually establish a False Claims Act claim because they wouldn't have submitted the certifications because they weren't submitting payment requests to Medicare and they wouldn't have certified compliance with the anti-kickback statute, right? Well, under the way the False Claims Act is worded, it also imposes liability on anyone who causes another to present a false claim for payment. And so in that situation, the allegation against Amgen would be they caused it. That's sort of where I was going. So then the theory of the claim against Amgen to begin with is that the way it's effectuating false claims is it's doing it through its clients, right? That's correct. So the initial public disclosures just require the inference that there are clients of Amgen who are submitting false claims. Any allegation of the original Amgen complaints would have involved a decision that clients actually were acting on the basis of the incentives that they were providing. No, Your Honor, because none of the disclosures are False Claims Act cases. One was an antitrust case. One was a RICO case. I mean these are not cases based on the submission of false claims. I understand. So then my question is you're saying given the allegations that were in those complaints, you could not have made out a False Claims Act case against Amgen. Is that correct? I'm saying it would be quite hard, yeah, especially to do so with particularity. I mean those complaints, I want to be clear, we're talking about those complaints as if they're complaints against Amgen. They're really not. They're claims against dozens of pharmaceutical manufacturers with almost no detail. And so the idea that There are very specific allegations against Amgen, right? It talks about the spread, it talks about Epigen in particular. Yeah, look, in one of the complaints, out of 397 paragraphs, there are eight that talk about Amgen. Five are about price reporting. Only three are about any kind of remuneration paid. One of them is just a conclusory they did it. The only specific thing is a reference to an Inspector General report from 1993 saying that in the dialysis center they had offered certain kinds of incentives. I mean it's so far removed from the conduct that we're describing in our complaint that I don't think there is any way with a straight face to say that U.S. oncology's involvement or the specific misconduct that we're accusing U.S. oncology of. And to be clear, we have quite a few specifics about this. We have explanations of the ways that they arranged for rebates that they passed on to their practices. They morphed that practice into a prebate practice in 2004. They arranged for sham data fees that Amgen executives admitted to us in reported conversations were bogus and wrong, but were paid anyway at U.S. oncology's behest. We have added so much to what was in the public domain. And to be clear, if you picked up those public complaints, refiled them and said U.S. oncology presented false claims. May I get you to spend a moment more on your 9B argument? I understand your theory that every invoice submitted represents that there's no kickback in connection with it. But I'm still not sure I understand why, without an assertion of a single invoice, a single claimant, a single date, and specifics as to the falsity, that you survive 9B requirements. Help me out. That's a fair question. The case that I would point you to that's the most on point in the kickback context is the Bookwalter case from the Third Circuit. We discuss it pretty extensively in our briefs. And it explains this idea that when the theory of falsity is one that implicates sort of a broad swath of claims because they're tainted upstream by this prior misconduct, that's a cognizable theory when you plead the scheme, the kickback scheme with particularity. And there's no dispute that we have. But that gets you to a reliable indicia that false claims were submitted under decisions like this Court's decision. Well, of course, we would consider the reasoning of the Third Circuit, but we're not bound by it. That does not tell us whether we're dealing with one claim, 10 claims, 10,000 claims. I mean, we have nothing here. And my particular concern is you had insiders providing information. And so to that extent, I'm not sure why we should accept this kind of generalized assumption that there had to have been fraudulent claims submitted. Sure. So I think it would be. I shouldn't think that way. Yeah. And I think the question that you want to ask, and I will spotlight that there is a bit of a circuit split about this piece of it. So in the First Circuit, a case that the other side cites, Kelly, they say you need factual or statistical evidence at the pleading stage. It has to be more clear. Contrast that with the Fifth Circuit's decision, the Colquitt case, where they say, no, you know, we accept allegations as true at the pleading stage and we draw favorable inferences in the plaintiff's favor, even when it's Rule 9b. And so in Colquitt, the Court says, when you have an underlying scheme and you have the scheme targeting hospitals, this was the use of stints, they're going to bill Medicare overwhelmingly when those stints are used on people over the age of 65. That makes the inference that claims were submitted permissible. The Ninth Circuit has similar precedent, the Selingo case we cited. And then we go to this Court's precedent in Chorches. Now, in that case, the Court says, our precedent, our rule here is consistent with the rules of the Third, Fifth, Seventh, Ninth, Tenth, and D circuits. And those are the circuits whose precedents we're citing. And it says, when you have a strong inference that claims were submitted, you're okay. Now, here, what do we allege? We allege that they were billing approximately $60 million to the government under Medicare Part B for these three specific identified drugs. Remember, all of these courts are applying Rule 9b in what I've described as a purposive manner. That is, as long as we give notice to them of the allegations against them and enable them to prepare a response. It's an on-information and belief pleading on. The $60 million? That's correct. Yeah, and I'm not sure that that will get you enough on 9b. But what else? What else? I just wanted to confirm that was an on-information and belief pleading. That's quite correct. Now, what we have alleged is that there are certain aspects of the scheme as well that only make sense if what you're doing is submitting claims to the government. So the net cost calculator document, for example, that was an important document that they used to figure out exactly what they should be negotiating for in kickbacks, it compared the price that they would be paying to the price they could get from the government. And, look, I'll admit that part of what we're basing our claim on, but this is in conjunction with the other things I've just mentioned, is the fact that we just know that when you're doing this much volume, lots of it's going to the government for chemo drugs, to Medicare and to Medicaid. That's how this business works. And I think that you can look at that and you can say, well, we're not going to draw an inference in your favor that any of those claims were tainted by these kickbacks. But I don't see on what basis you would refuse to do so under the ordinary rules of the pleading stage as explained by this court in Chorchess. That is to say, you know, if you have services that are routinely charged to the government, and here we're talking about a large practice, 39 states, you know, dozens and dozens of practices at least, hundreds of physicians. The idea that, and the kickbacks are being implemented at the root level of this tree, right, that is by U.S. Oncology Corporate, the head organization that then passes on those savings to all of those practices. And so when the root has the kickbacks in it, the idea that none of the branches touches the government, I think, is a very implausible inference. Now, if you think Rule 9b demands more, I do think we have a bit more. We have allegations about the ways that the government was paying for cancer drugs. Now, we don't have a specific date or an invoice or something like you said, but they didn't have that in Chorchess either. And I think that it wasn't necessary there. And I would say, Chorchess is also one of those cases, like the ones... They did have a sort of one-to-one relationship, right? Because there was falsification of records that could only, the only reason to falsify those particular records is to file a claim, right? You don't have that here. Absolutely. And this is the contrast that I was drawing earlier between different types of cases. In Chorchess, the question was, you know, you're doing these ambulance runs. Are they medically necessary? And to figure that out, you really do have to look at the patients one by one. You have to say, like, okay, for this guy it's necessary, this guy's not necessary, right? On a given day, an ambulance could do 10 runs and six of them could be medically necessary and four not, right? But, and so it does make sense to say you really want claim-specific information in a case like that, or transaction-specific information in a case like that. When you have this presumptive taint that comes from kickbacks and it's coming in at the root of the organization, it's a different story. And that's Bookwalter. That's why I'm pointing you to that Third Circuit case. That's Colquitt. And so it's just a different fact pattern, but if you apply the same legal rule to this distinct fact pattern, we think the result should be the same. And to be clear, Chorchess itself says, we apply Rule 9b in a purposive way and we apply it on a case-by-case basis. And when you think about the purpose, do they know which drugs we're accusing them of taking kickbacks on? They sure do. We've identified three of them. Do they know who was involved? Yeah, we've identified U.S. oncology employees by name. We've talked about the contracts they negotiated to get these kickbacks. And so I think there's more than enough to provide them with notice and to assure everybody, including this court, that these allegations are not the sort of speculative allegations that you want to throw out under Rule 9b at the pleading stage. Now, it may be the case that they'll say and they'll show that they didn't present any false claims to the government. They just didn't present claims to the government for those things. If that's so, I mean, first I'll eat my turban, but second, other than that, I mean, they'll win. They'll win quickly. And this case will be over. But that's a question for discovery and for further development of the case. For purposes of the allegations, I think it's clear we have enough. I see I've gone well over time, so I apologize for that. If there are no other questions. Okay, thank you very much, Mr. Singh. We'll hear back from you on rebuttal, but let's turn to the appellee, Ms. Hughes. May it please the Court, Lena Hughes on behalf of Appellee U.S. Times. Ms. Hughes, pull those mics in. The sound is just horrendous in this place. Here we go. All right. Thank you. The District Court... Thank you. Thank you, that's perfect. Thank you. The District Court correctly dismissed this False Claims Act suit on two independent grounds. The first is that prior to Relator P.S. Intel even bringing this action, there were three prior complaints accusing Amgen of conspiring with its customers to obtain inflated reimbursements from the government. And Relator suit, which is based on that same conspiracy, is barred by the public disclosure bar because Relators are not original sources. And second, despite accusing U.S. Oncology of submitting false claims to the government across the course of an entire decade, there are virtually no facts in the complaint referring to U.S. Oncology's submission of claims to the government. And so they have failed to plead fraud with the particularity that Rule 9b requires. I'd like to start with the public disclosure bar. Under that bar, this Court has said the purpose is to reject suits that the government was capable of pursuing itself. And this is one of those cases because as I mentioned before Relator P.S. Intel filed suit, there were three public complaints expressly alleging that Amgen conspired with its customers to obtain inflated reimbursements from the government on Amgen drugs. And this is the same scheme that is alleged in the Relator's complaint. Does it matter if the way they schemed or the mechanism by which they schemed was different? That would not matter if the scheme was previously disclosed and it was the same essential scheme, but here the mechanism was the same as previously disclosed. So what the prior disclosures explained was that the way that Amgen and its customers created the price inflation was by paying and accepting kickbacks that reduced the effective price of the drugs. U.S. Oncology is not named in any of these three earlier lawsuits as a confederate in the scheme, right? That's correct. U.S. Oncology is not named. Under the public disclosure bar, is that a problem for you? It is not. The language of the public disclosure bar asks whether the action is based upon the prior disclosures. And as this Court has said, in the past it only has to be based in part on the prior disclosures. Even if the Relator is contributing additional information, then perhaps he'll be able to bring the suit if he's an original source. Well, the lawsuit here is against U.S. Oncology. It's not against Amgen, right? It was originally against Amgen. I know. But yes. As it stands now, it's not. And to that extent, what in the earlier lawsuits would put someone on notice that U.S. Oncology, when approached or itself, agreed to this scheme? I mean, are you saying that these three lawsuits serve notice on everyone for an action against anyone who ever purchased from Amgen? So what I think it provided notice of was that there was widespread complicity among Amgen's customers. That was expressly alleged at the Citizens' Complaint, paragraph 98. Widespread interstate cooperation of health care providers was a necessary component of defendants' fraudulent scheme. And there are other allegations in the Westchester complaint as well, making clear that the customers were complicit and that it was pervasive. So I do think it put the government on notice that Amgen's customers... If that allegation were there, this wouldn't be barred. If that allegation were not there, if it didn't say anything about the customers being complicit, would this case be barred by the public disclosure board? It would be a more difficult case, but I don't think the answer would ultimately be different. And I would point the Court to the sixth... Because I thought your point was that you can't explain the claims here without talking about the Amgen scheme, and so then it's at least based in part on what's revealed in the other complaints, right? That is true. The prior complaints were alleging that Medicare and Medicaid was defrauded. That was only true if Amgen's customers were complicit and submitting complaints. And it's essentially... That's why they're alleging the same scheme here. We're just one of the customers not expressly named in the prior complaints. And I would point this Court to the Sixth Circuit's decision in Poteet v. Medtronic. I think that's a very analogous case where the prior disclosures alleged that Medtronic was paying kickbacks to other physician customers. It didn't say it's paying to all their physician customers, and yet the Sixth Circuit had no trouble concluding that the later suit against other Medtronic customers was still barred by the public disclosure bar. The public disclosure bar is meant to avoid people profiting by bringing these lawsuits when they haven't really discovered the misconduct, right? That's correct. So my concern here is that finding the public disclosure bar applicable here would suggest that these three lawsuits basically establish that every Amgen customer is involved in this scheme, when in fact it would require further digging to know that, right? I don't think you need to conclude that the prior disclosures said that every Amgen customer was complicit or was involved. And that's because the question is not whether the government needs to do any additional investigation. It almost always does because the public disclosure bar doesn't just require the prior disclosure to have been an FCA action that was suggested by opposing counsel. All of the time, it is not even a fraud claim that was previously disclosed. It's just facts that were disclosed in which the government may be able to infer that fraudulent claims were submitted. They almost always have to do additional investigation. And in the other circuits' cases that were cited by the other side, it was clear the government would have had to do additional investigation, take the GEAR case from the Seventh Circuit. There were general allegations of widespread fraud across the teaching hospitals in the United States. It didn't say every single teaching hospital is committing this fraud. And the government clearly could not have taken the public disclosures, put them in a complaint, and then rested its case. It needed to do additional investigations. And the point is here, the prior disclosures revealed what was, in essence, a hub-and-spoke conspiracy between Amgen and its customers. And the government knew the most important fact, the hub, who is Amgen. So it didn't need to go through each of Amgen's customers, customer by customer, to determine who the wrongdoer is. All it had to do was investigate Amgen and determine who Amgen was paying kickbacks to. You're saying the public disclosure could have put the government on notice to do the kind of investigation Relator apparently did here, which is interview Amgen executives and their clients and find out what's going on, right? And that would be sufficient for the bar to apply? Yes. Does it matter what opposing counsel said, which is that they actually uncovered that U.S. Oncology was soliciting the kickbacks, and so that's a different kind of scheme, and it goes to their willfulness in submitting the claims for payment? That's legally irrelevant based on their theory of the case, which is that we falsely certified compliance with the anti-kickback statute, which prohibits receipt and solicitation of kickbacks. And I want to point out... It could have been that you didn't realize it was a kickback. You just thought it was a permissible rebate or something, but the fact that you were soliciting it maybe makes you more comfortable. Is that not possible? I don't think it is relevant to the legal theory that they're pleading on their False Claims Act. And I want to emphasize the prior disclosures did not say the customers were passive recipients of kickbacks. It alleged that they were complicit and they were agreeing with Amgen and the other drug manufacturers to keep these things secret from the government, because if they didn't keep it secret, then the price inflation scheme wouldn't have worked. But this case is... The prior cases are certainly different than a situation where it was just an individual allegation against Amgen and one customer. This was a series of disclosures not only as to Amgen, but as to a number of pharmaceutical companies throughout the country that this was a practice that you used the word pervasive. Yes. I'll take the time to go back and look and make sure that that's a fair characterization. But so I take it your point then is that because the prior lawsuits cast a picture that Amgen was generally doing this, then anyone who was doing business with Amgen was kind of... The government was kind of on notice that maybe they ought to look as to U.S. Oncology, right? Yes, and U.S. Oncology, as admitted, is one of Amgen's major customers, a group purchasing organization, one of the largest cancer treatment networks in the nation. U.S. Oncology would have been very high on the government's list. And I just want to point out the consequences of the contrary rule would be an absolute proliferation of QI-TAM suits because anytime there is a disclosure of a fraudulent scheme between a company and its customers, then under relator's rules, you could have dozens or hundreds of follow-on QI-TAM suits that are really just copying the prior disclosures and adding the name of one more customer. And then under relator's reasoning, none of those would be based on the prior disclosures. All of those relators would be entitled to take a portion of the government's own recovery. And we don't think that that can be right at all. I see my time is up, so we would add... You can address the Section 9B thing a little bit. You went over to the other side. Yes, so under Rule 9B, we also think the district court was correct to conclude this action needs to be dismissed. It's clear the ordinary rule under 9B is you have to plead the who, what, where, when of the false statements. Here, those are the claims to the government. And they don't argue that they have pleaded that. They're asking for an exception in the context of kickback schemes. But no court has recognized an exception to Rule 9B based on a kickback scheme, based on a theory of underlying fraud. And the Bookwalter case, which was not a kickback scheme but a Stark Act violation, in that case, the presentment of claims to Medicare was conceded. So it was not... I'm sorry, I didn't hear you. The presentment of claims to Medicare was conceded? Yes. In that case... But come on, I mean, obviously U.S. Oncology presented some claims to Medicare, right? And that's not the question under Rule 9B. And they did it for these drugs, right? I mean, that's like a very obvious inference. That's not the question under Rule 9B. It's their pleading obligation. But I also want to point out... I guess I'm asking what purpose it serves. So if I'm pretty confident that they would have filed claims to Medicare to pay for epigen or other cancer drugs, which seems like a reasonable thing that happens all the time, and it seems that it was not revealed that they were doing kickbacks, then don't we have a pretty high degree of confidence that at least under their theory, false claims were filed with the government? Well, they have alleged a scheme that goes across an entire decade. From 2001 to 2011, we allegedly submitted false claims. So I think the purpose is to identify somewhere in that decade for us, when and where were these false claims allegedly submitted? You can't just say, because you distribute such a large volume of drugs, you must have submitted a false claim at some point. And now their answer to that is that somehow all of the claims were tainted. That's not legally or factually supported by their complaint. Again... But isn't that like a merits question? So if in fact you're receiving kickbacks and you didn't disclose, and you said you complied with the anti-kickback statute and got reimbursements, maybe those weren't false claims because they weren't actual kickbacks. Maybe it was permissible or so on. But isn't that a merits question? I mean, if now we're just trying to decide whether they have plausibly alleged that there were in fact claims for payment presented to the government that said, we've complied with the anti-kickback statute, don't we have a pretty fine degree of confidence that that happened? So, no. It is not a merits question. We're not challenging whether they've adequately alleged an anti-kickback statute violation. We're saying even if they did, that doesn't mean that all claims subsequently submitted by the defendant were tainted. They don't have allegations in the complaint to support that. Again, they're saying... So you're talking about... Why is that? Okay, so because they alleged that we submitted claims between 2001 and 2011. They say all of those claims were false, but the only allegations in the complaint say that we negotiated volume discounts and rebates between 2002 and 2004. And there's no law suggesting that if a defendant has once received  then all of their claims on drugs in perpetuity are false.  that suggests that. So you're saying they would have to show some kind of close connection between the receipt of a kickback and the specific claim that was submitted by the defendant for payment. Yes. And they essentially acknowledge that at page 52 of their brief where they say there needs to be a link between the kickback and the drug or the item that you're seeking reimbursement for. So in other words, we don't even have that information with respect to the 2002 to 2004 time period because we don't know which physicians allegedly received these discounts and rebates. Whether those physicians then prescribed drugs to Medicare and Medicaid patients and whether those doctors then sought reimbursement for those patients from the program. And so your position and I may ask Mr. Singh about this so I want to know how you view this is that even if they can plausibly plead that some claims unspecified are fraudulent because they can't demonstrate the causal link for all the claims they have a 9B obligation to tell us which claims on which date are fraudulent. Yes, at a minimum. How can they do that? How can a plaintiff reasonably be expected to do that? Well, there would certainly be types of relators who would have the claim detail information such as relators that worked at the physician practices. Insiders. Insiders. There would be plenty of types of relators that would have that information. But even if they didn't have the claim detail information there's a way they could get a lot closer. Tell us the physician who received the volume discounts or the rebates. Tell us the date they prescribed it to a patient. Tell us that patient was a Medicare or Medicaid eligible patient. And tell us that this physician practice routinely requests reimbursement from Medicare and Medicaid. And that's a point that was made actually in the Kelly versus Novartis case which was a kickback scheme and did apply Rule 9B. And what the court there said is that you cannot just tell us that the physician is signed up for a federal government reimbursement program, received incentives and then prescribed the drug. That's not enough to plead under Rule 9B and we don't even have that level of detail here. So we think the district court was clearly correct to hold that the allegations of the complaint do not satisfy Rule 9B. Thank you very much Ms. Hughes. We'll turn back to Mr. Singh and then we'll go to the report. So, beginning on the public disclosure question, they lead by telling you the question is could the government have pursued the case based on the public disclosures? I think even if you frame it that way, it's fair to ask how? Had we taken the public disclosures or the government taken the public disclosures and said that U.S. oncology is in here, it would have done, it would have been plainly insufficient. But the government could have done exactly what the relator here did, which is talk to Amgen and investigate its customer. Right, but that's like saying that if you have a public disclosure that says kickbacks are rampant in the pharmaceutical industry. Now, every kickback case involving pharmaceuticals has been publicly disclosed because the government could go and investigate that. But if it had programs that was employing it pervasively across the medical community, then doesn't that at least provide some portion of the claim? Honestly, not really. It takes care of one of the conspirators, doesn't it? Sure. They have a program in place and they end up being held accountable for it with regard to co-conspirators A through D. You happen to be co-conspirator F and either you weren't found or you weren't sued. Sure, but it's unnamed co-conspirator F, right? The point is that, look, there are cases that say when what you're talking about is a relatively narrow class of potential defendants, you know, one, three, nine. It's a singular conspiracy with multiple spokes to the wheel with a hub. Amgen's a hub and the medical practices are the spokes. Right, but why isn't it knowing the nature of the hub and that there are spokes out there, at least a significant part or any part of your claim? Sure. The short answer is that there are thousands of spokes. Well, of course. And to say that there are thousands doesn't mean then that they don't share a common factual basis, that being the conspiratorial agreements that exist as a common policy of Amgen. Go out and encourage physicians to participate with us in falsifying the actual cost of the drugs that they're prescribing. I understand, Your Honor, but here our allegation is actually that U.S. Oncology had its own special deals. Okay. What makes it different? What makes U.S. Oncology different? Sure. So to be clear, and therefore not somehow not on the government and the public in general is not on notice from the other lawsuits. Sure. So aside from the fact that U.S. Oncology is not named in those suits, there is the fact that we identified the specific mechanisms that U.S. Oncology negotiated for. I'll give you just one example that's nowhere in the public disclosures. They negotiated for data fees as a specific way to circumvent, to receive kickbacks without receiving them in the form of special rebates. And we've re-wielded their market power to engineer this scheme. You know, we're treating this hub and spoke idea as the idea that Amgen had this policy, Amgen did this thing, but what we're adding to it is really that U.S. Oncology was the bad guy, the principal mover and shaker in its own scheme. But I'm not sure that would have worked for you. I mean, I'm not sure you would have that argument if the three earlier lawsuits had been specific that Amgen and U.S. Oncology were the two. I mean, if it had been specific about that, who initiated it would not, I don't think, would have spared you the public disclosure bar. That's possible, Your Honor. I mean, it would depend on what they said about what those lawsuits said. Because I do want to make clear we're distinguishing on two axes. One is did you identify the defendant and the public disclosure and number two is did you identify    public disclosure   the  disclosure and number four, did you identify the defendant and the public disclosure and number five? Does this mean we have no public disclosure? And number five, did  identify the defendant and the public disclosure? Does this mean we have no public disclosure? And number six, did you identify the defendant and the public disclosure? Does  mean we      number seven, did you identify the defendant and the public disclosure? Does this mean we have no public disclosure? And number eight, did you identify the defendant and the public disclosure? And number nine, did you identify the defendant and the public disclosure? And number 10, did you identify the defendant and the public disclosure?   11, did you identify the defendant and the public disclosure? And number 12, did you identify the defendant and the public disclosure? And number 13, did you identify the defendant and the public disclosure? And number 14, did you identify the defendant and the public disclosure? And number 15, did you identify the defendant and the public disclosure? And number 16, did you identify the   public disclosure? And number 17, did you identify the defendant and the public disclosure? And number 18, did you identify the defendant and the public disclosure? And number 19, did you identify the defendant and the public disclosure? And number 20, did you identify the defendant and the public disclosure? And number 21, did you identify  defendant and the public disclosure? And number 22, did you identify the defendant and the public disclosure? And number 23, did you identify the defendant and the public disclosure? And number 24, did  identify   and the public  And number 25, did you identify the defendant and the public disclosure? And number 26, did you identify the          identify    public disclosure? And number 28, did you identify the defendant and the public disclosure? And number 29, did you             defendant and the public disclosure? And number 27, did you identify the defendant and the public disclosure? And number